# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 56155-7-II |
| Respondent, | |
| v. | |
| DAKOTA MIKALLE COLLINS, | UNPUBLISHED OPINION |
| Appellant. | |

WORSWICK, J. — Dakota Collins pleaded guilty to one count of second degree murder with a firearm enhancement, one count of attempted first degree robbery, and two counts of second degree unlawful possession of a firearm for acts committed when he was a juvenile. His case was remanded for resentencing because the trial court failed to meaningfully consider his youth.

The trial court resentenced Collins to a standard range sentence, and Collins appeals for a second time. Collins argues that the trial court failed to meaningfully consider youth as a mitigating factor. The State argues that Collins cannot appeal his standard range sentence. Collins also argues, and the State concedes, that there is a scrivener's error in the judgment and sentence.

We hold that Collins's standard range sentence is appealable. We further hold that the trial court meaningfully considered Collins's youth as a mitigating factor, and that he is entitled

to correct the scrivener's error in his judgment and sentence. Accordingly, we affirm and remand for the trial court to correct the scrivener's errors.

FACTS

I. BACKGROUND AND SENTENCING

When he was 16 years old, Dakota Collins and six co-defendants attempted to rob Lorenzo Parks. When Parks claimed Collins's gun was fake, Collins removed the magazine and reinserted it. After Parks resisted, Collins shot him. Juvenile court declined jurisdiction, and the State charged Collins as an adult with second degree murder with a firearm enhancement, attempted first degree robbery, and two counts of second degree unlawful possession of a firearm. Collins pleaded guilty. In the statement of defendant on plea of guilty form, Collins admitted that he intentionally shot and killed Parks while he and his codefendants were attempting to rob him. As part of Collins's guilty plea, the State agreed to recommend a standard range sentence of 200 months plus the 60-month firearm enhancement. Collins was permitted to ask for a sentence as low as 66 months.

Collins argued for an exceptional sentence of 96 months, arguing that his youth and the circumstances of his upbringing warranted an exceptional downward sentence. He argued that he had attention deficit hyperactivity disorder and oppositional defiant disorder, likely related to his biological mother's drug use during pregnancy, and that he suffered from post-traumatic stress disorder (PTSD) due to abuse he endured at a military academy. Collins had a history of abusing drugs in the time preceding the shooting. Collins submitted an expert's report detailing the impact of these conditions and his youth on his judgment and ability to control impulses.

The trial court heard testimony from Parks' father, sister, brother, and sister-in-law about how the loss of Parks had impacted their family. The trial court heard testimony from April A. Gerlock, Ph.D., a psychiatric nurse practitioner who evaluated Collins and diagnosed him with "moderate to severe, chronic PTSD." Clerk's Papers (CP) at 139.

At the hearing, defense counsel asked Gerlock to explain how the PTSD "may have played a part in the actual shooting incident." 2 Verbatim Report of Proceedings (VRP) (Oct. 5, 2017) at 45. Gerlock testified that adolescent brains are less developed in the prefrontal cortex, the area responsible for exercising judgment and understanding consequences, and the prefrontal cortex is also "not as active for someone with PTSD." 2 VRP (Oct. 5, 2017) at 47. In addition, PTSD impairs the mid-brain, "the part of the brain that stores fear-based memories," and causes it to be "more reactive." 2 VRP (Oct. 5, 2017) at 46-47. Gerlock explained that Collins's adolescence and PTSD together "really compounded his situation in terms of how he perceived the events as they unfolded that night, perceived the situation as threatening, and responded in that reactive impulsive way with lethal violence." 2 VRP (Oct. 5, 2017) at 47. Gerlock also submitted a more detailed report which concluded, "Substance abuse treatment, trauma-informed therapies, and life skills are all critical for [Collins's] rehabilitation." CP at 142. She also concluded that Collins's judgment was "impaired because of his young age, major mental health disorders, and further impaired by marijuana and/or alcohol intoxication." CP 305.

The trial court heard from Collins's biological mother, who shared her regrets that she used drugs heavily during her pregnancy, as well as her opinion that Collins "was not the same boy when he returned from the military school." 2 VRP (Oct. 5, 2017) at 49.

3

The trial court heard testimony from Catholic Community Services counselor Evelyn Maddox. The counselor started working with Collins prior to his offense, and she had been trying to get him help, but Collins was arrested for shooting Parks before he could receive the benefit of these services. The counselor ended her testimony by stating, that she was sure Collins would take advantage of programming in prison because he had been very receptive.

Collins expressed his remorse to the court. He addressed Parks's family, saying, "I want you to know this: I promise you that with every breath and bone in my body, I will commit to changing my life and myself so that I will never put another family in the spot I have put yours in." 2 VRP (Oct. 5, 2017) at 71.

The court described Gerlock's report as "very interesting" before concluding, "I don't know. I don't think [Gerlock] knows. I think that's why she phrased it [as] what you may have been experiencing at that time. But the facts as they sound to me don't sound like a person who was in fear for their life." 2 VRP (Oct. 5, 2017) at 74.

Addressing Collins's youth, the trial court agreed with the State "that nothing miraculous happens on your 18th birthday. You don't suddenly have your brain fully developed so that you're now going to make good choices and now going to be able to assess risks and consequences of your behavior differently than you did the day before you turned 18." 2 VRP (Oct. 5, 2017) at 75. Looking to the specific facts of this case, the trial court told Collins, "I suspect that you actually did have a good appreciation [of risks and consequences] when you had a gun in your hand, a loaded gun in your hand, and took the magazine out and put it back in." 2 VRP (Oct. 5, 2017) at 75. The trial court concluded that Collins likely "had an appreciation for

4

the risk associated with that gun and what would happen if you pulled the trigger." 2 VRP (Oct. 5, 2017) at 75-76.

In reviewing the circumstances of Collins's childhood, the trial court commented,

[A]s a human being and as a mother, it's very sad to read the packet of materials that [defense counsel] gave me about your life. It's very sad that you were exposed to drugs before you even had a chance at a life. It's very sad that you suffered at that academy.

2 VRP (Oct. 5, 2017) at 76. The trial court assured Collins, "I want you to know that I appreciate the materials that [defense counsel] has put forward, and that has given me—that I've given a great deal of thought to that." 2 VRP (Oct. 5, 2017) at 76.

Throughout its ruling, the trial court referenced *State v. Houston-Sconiers*, 188 Wn.2d 1, 391 P.3d 409 (2017), and recognized its discretion to impose an exceptional mitigated sentence based on Collins's youth:

I agree with [defense counsel] that I don't think the *Houston-Sconiers* or the line of cases leading up to it supports the idea that if the State amends the charges or recommends something below the high end of the range, that that's taking into consideration youth and age and all of those things that Houston-Sconiers talks about.

But I do think that the Court isn't going to ignore that, because clearly I would have expected that that's part of what was taken into consideration by the State. But I believe that the Court shouldn't defer to the State and assume that they did that, but do its own assessment of that.

. . . .

I do think that *Houston-Sconiers* requires the Court to consider all of the factors, not just the act itself. But it can't—it's like, okay, how do you consider immaturity or failure to appreciate risks and consequences. You don't consider those in a vacuum. You consider them in the context of what brings us all here today, and that is that you chose to pull the trigger, and a person died as a result.

. . . .

5

> And to Mr. Collins, considering all of these factors, including all of the goals of sentencing that I've already touched on, of what is a just punishment, what will be a deterrent, what would it take to rehabilitate you—which I honestly didn't hear a lot about—and how do we protect the public, I do think a sentence within the standard sentencing range is appropriate, plus the firearm sentencing enhancement and a period of community custody.

2 VRP (Oct. 5, 2017) at 74-77.

The trial court denied Collins's request for exceptional sentence downward, and it imposed the State's recommended, standard range sentence of 260 months for second degree murder with the firearm enhancement. The sentences for the remaining convictions would be served concurrently, so the total term of confinement was 260 months.

## II. APPEAL AND RESENTENCING

Collins appealed his standard range sentence to this court, "arguing that the trial court failed to fully and meaningfully consider his youth as a mitigating factor," and this court "held that the trial court did not abuse its discretion and affirmed Collins's sentence." *State v. Collins*, No. 51511-3-II, slip op. at 1 (Wash. Ct. App. Dec. 15, 2015) (unpublished).[1] "Collins then petitioned the Washington Supreme Court for review," and the Supreme Court issued an order granting Collins's petition, and remanding for this court's "reconsideration in light of *State v. Delbosque*, 195 Wn.2d 106, 456 P.3d 806 (2020), which clarified that sentencing courts must fully and meaningfully consider on the record how the characteristics of youth may mitigate the culpability of a juvenile offender." *Collins*, No. 51511-3-II, slip op. at 1.

---

[1] https://www.courts.wa.gov/opinions/pdf/D2%2051511-3-II%20Unpublished%20Opinion.pdf

This court then reversed its prior holding and remanded for the trial court to fully and meaningfully consider Collins's youth and how the characteristics of youth may mitigate the culpability of a juvenile offender. *Collins*, No. 51511-3-II, slip op. at 18.

On remand, the trial court held a resentencing hearing. Collins submitted much of the same evidence he submitted at his first sentencing hearing. The trial court considered the transcripts of the prior plea hearing and sentencing hearing, Collins's sentencing memorandum and attachments, resentencing memorandum, criminal history, victim impact statements, and other testimony submitted on behalf of both Collins and Parks.

Collins made a statement in allocution. He stated that he was remorseful, and explained how he did not fully understand the consequences of his acts when he committed them, but that as he matured, he understood. He stated that he was engaged to be married, he had obtained his Graduate Educational Degree (GED), he had taken college courses, and had joined voluntary group therapy, and other programs in prison. He stated that he had committed no major or violent infractions while incarcerated. He said he was taking responsibility for his actions and had been making good on his promise to change.

In its oral ruling, the trial court stated that it was taking into consideration all of the evidence and testimony submitted at Collins's first sentencing, as well as the current sentencing hearing. The court summarized the facts of the case and recounted the events of Collins's life from birth to the time of trial. It recounted the evidence of Collins's mother's drug use during pregnancy, Collins's adoption and subsequent experience at the military academy, where Collins witnessed and experienced physical and emotional abuse. The court summarized that Collins had a difficult childhood and was diagnosed with attention-deficit/hyperactivity disorder,

oppositional defiant disorder, and PTSD. In the past, Collins's behavior had "resulted in numerous suspensions from school and ultimately, after threatening a teacher, he was expelled" and pleaded guilty to harassment for threatening bodily injury. 1 VRP (Aug. 10, 2021) at 31.

The trial court summarized recent Supreme Court youth sentencing opinions, including *Miller v. Alabama*, 567 U.S. 460, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012), *State v. O'Dell*, 183 Wn.2d 680, 358 P.3d 359 (2015), *State v. Solis-Diaz*, 194 Wn. App. 129, 376 P.3d 458 (2016), *State v. Ramos*, 187 Wn.2d 420, 387 P.3d 650 (2017), *State v. Houston-Sconiers*, 188 Wn.2d 1, 391 P.3d 409 (2017), and *State v. Delbosque*, 195 Wn.2d. 106, 456 P.3d 806 (2020), explaining how each case pertained to Collins's case. The court then discussed this court's remanding opinion, to "hopefully fill[] in the blanks that we're missing from [its] previous ruling." 1 VRP (Aug. 10, 2021) at 40.

On the first *Houston-Sconiers* factor, which requires the trial court to consider "'age and its hallmark features such as the juvenile's immaturity, impetuosity and failure to appreciate risks and consequences,'" the trial court explained that Collins was sixteen years old at the time of the crime, but disagreed with this court's statement that, "'Collins did not commit this crime at all close in time to his 18th birthday.'" 1 VRP (Aug. 10, 2021) at 41. The trial court stated, "By my calculation, his age at the date of this offense was 16 years, 6 months and 25 days. I would consider that close in time to his 18th birthday." 1 VRP (Aug. 10, 2021) at 41.

The court recognized that "adolescent brains are not fully developed with areas that control impulses, perceive consequences and temper emotions." 1 VRP (Aug. 10, 2021) at 43. However, the court took issue with this court's statement that the trial court had recharacterized Gerlock's testimony. 1 VRP (Aug. 10, 2021) at 42. The court explained that it stood by the

statement regarding what Collins *might have* been experiencing at the time of the crime and that

"I don't know and I don't think Dr. Gerlock knows what [Collins] was experiencing." 1 VRP

(Aug. 10, 2021) at 42. The court noted that Gerlock stated that she was at the hearing to "'try

and stitch it together a little bit better for people to understand what may have been going on for

Mr. Collins in the days leading up to the event.'" 1 VRP (Aug. 10, 2021) at 43. The court noted

that Collins reported to Gerlock that he had felt intense fear and anger, but that Gerlock did not

speak to Collins's credibility, and further the trial court saw no facts that would have caused any

emotional flashback to cause Collins's fear and anger. The court noted that Parks was

outnumbered and had walked away when he was shot, and that "an underdeveloped adolescent

brain and PTSD do not explain this to me." 1 VRP (Aug. 10, 2021) at 44.

Regarding the second *Houston-Sconiers* factor, which requires the court to consider "the

nature of the juvenile's surrounding environment and family circumstances, the extent of the

juvenile's participation in the crime, and 'the way familial and peer pressures may have affected

him,'" the court explained:

> Having reread the defendant's Sentencing Memorandum and its attachments—and this is from the October of 2017 sentencing—as well as the Verbatim Report of Proceedings from both the plea and the sentencing hearings, this Court finds limited evidence of how Mr. Collins' life experiences impacted him as an individual. Certainly, there are reports of things that happened to him, but there's no testimony that takes that and tells me how that caused him to make the decisions that he made.

> Dr. Gerlock's report relates Mr. Collins' reporting of life experiences. But other than PTSD, it did not provide any individualized assessment.

> I previously acknowledged Mr. Collins' life experiences, including being subjected to drugs prior to birth, becoming a ward of the State, being adopted, the abuse he suffered at the military academy, the things he experienced growing up. I think there was reference in the record to shootings and exposure to gangs. I stand by my prior statement that these things are not what we wish for our children. But

9

many people who experience these same events, grow up to be productive members of society. The majority of them certainly do not grow up to kill others.

> The burden is on Mr. Collins to show me the relationship between those things that happened to him as a youth and what happened that night.

1 VRP (Aug. 10, 2021) at 45-46; *Houston-Sconiers*, 188 Wn.2d at 23 (quoting *Miller*, 567 U.S. at 477). The court recognized that peer pressure, in context of Collins's life experiences and feelings of abandonment, may have influenced his decision to shoot Parks that night. It also explained:

> Mr. Collins' life experiences to that point, experiences that caused him to feel abandoned, converged to make him more susceptible to peer pressure than if he had a strong sense of self-worth. And to that extent, I do believe that that bodes in favor of the Court possibly considering a lower sentence.

1 VRP (Aug. 10, 2021) at 46.

As to the third *Houston-Sconiers* factor, which requires the court to consider "any factors suggesting that the child might be successfully rehabilitated," the court explained:

> The only evidence presented at the sentencing hearing on this point was the testimony of Evelyn Maddox, a youth peer counselor from Catholic Community Services. She testified very briefly that she had started to work with Mr. Collins before this incident, trying to get him services in the home. But before she could get him those services, he was arrested for killing Mr. Parks. So we don't really know how he would have responded to those services. Ms. Maddox testified that she thought Mr. Collins was receptive to change. And she also said, though, she wasn't there to advocate for one side or another.
>
> During his allocution, Mr. Collins promised to change. While not everyone makes promises to change, the Court hears those promises made at sentencing with a healthy dose of skepticism, for what should be obvious reasons.
>
> To his credit, Mr. Collins did express remorse. I thought he was very articulate at his sentencing in October of 2017, and he made a commitment to change.

1 VRP (Aug. 10, 2021) at 47; *Houston-Sconiers*, 188 Wn.2d at 23 (citing *Miller*, 567 U.S. at

477.). The court also considered that since his first sentencing in 2017, Collins obtained his

GED and participated in committees and various programs, which showed Collins's willingness

and capacity for change.

The court summarized its ruling:

Reflecting back on the case law that was cited by the Court of Appeals and that I summarized today and this Court's review of all the evidence submitted by the State and the defense, I would say the following: The defendant in this case was closer to 17 than 16 at the time he killed Mr. Parks. The Court did not impose either a literal or a de facto life without [parole] sentence…. Mr. Collins, has the burden of proving by a preponderance of the evidence that the crime that he committed reflected transient immaturity and that an exceptional sentence below the standard range is justified. I don't believe the defendant has met that burden and that he should be given an exceptional sentence downward.

The Court finds that the only appropriate sentence in this case is a standard-range sentence, plus the firearm sentencing enhancement, plus community custody.

1 VRP (Aug. 10, 2021) at 48-49 (some alteration in original). Thus, the trial court reimposed its

prior standard range sentence of 260 months, although the judgment and sentence form

erroneously stated 265 months.

Collins appeals his sentence.

ANALYSIS

I. ABILITY TO CHALLENGE THE STANDARD RANGE SENTENCE

As a preliminary matter, the State argues that Collins's appeal is barred by RCW

9.94A.585(1). We disagree.

The Sentencing Reform Act of 1981 (SRA), chapter 9.94A RCW, generally prohibits

appeal of a standard range sentence. RCW 9.94A.585(1). When a defendant challenges the

denial of an exceptional sentence, review is generally limited to circumstances where the trial

11

court displays (1) a categorical refusal to award an exceptional sentence downward under any circumstance, (2) reliance on a constitutionally improper basis for sentencing (sex, race, religion, etc.), or (3) failure to recognize discretion to impose an exceptional sentence downward. *State v. McFarland*, 189 Wn.2d 47, 56, 399 P.3d 1106 (2017); *State v. Garcia-Martinez*, 88 Wn. App. 322, 330, 944 P.2d 1104 (1997); *O'Dell*, 183 Wn.2d at 697-99.

However, a defendant may challenge the *procedure* by which a standard range sentence is determined, including the basis for rejecting an exceptional mitigated sentence. *Delbosque*, 195 Wn.2d at 126. Therefore, a party may challenge "'the underlying legal conclusions and determinations by which a court comes to apply a particular sentencing provision.'" *Ramos*, 187 Wn.2d at 433 (quoting *State v. Williams*, 149 Wn.2d 143, 147, 65 P.3d 1214 (2003)). For instance, in *Ramos*, our Supreme Court considered on the merits an appeal of a standard range sentence that a juvenile offender alleged violated the Eighth Amendment. 187 Wn.2d at 433, 436-53. Youth is not a per se mitigating factor that justifies an exceptional sentence below the standard range when a juvenile offender is convicted of a crime. *O'Dell*, 183 Wn.2d at 695.

Here, Collins argues that the trial court failed to meaningfully consider the required sentencing factors. The proper consideration of these factors is required to assure that Collins's sentence is not in violation of article I, section 14 of the Washington Constitution. *In re the Pers. Restraint of Forcha-Williams*, 18 Wn. App. 2d 167, 182, 490 P.3d 255 (2021). Therefore, this court holds that Collins may challenge the adequacy of the trial court's consideration of these factors as underlying legal conclusions or determinations by which the trial court comes to apply a particular sentencing provision.

Thus, we review Collins arguments that the trial court failed to meaningfully consider mitigating factors of Collins's youth.

## II. YOUTH AS A MITIGATING FACTOR

Collins argues that the resentencing court abused its discretion at the hearing because it failed to adequately consider the mitigating factors of youth. We disagree.

"[C]hildren are different from adults" for sentencing purposes. *Houston-Sconiers*, 188 Wn.2d at 18. Although the trial court has broad discretion to impose an appropriate sentence, it also has a duty to ensure that proper consideration is given to the factors enumerated in *Houston-Sconiers*. *Solis-Diaz*, 194 Wn. App. at 136-42, *rev'd on other grounds*, 187 Wn.2d 535, 387 P.3d 703 (2017). We review sentencing decisions for abuse of discretion. *Delbosque*, 195 Wn.2d at 116.

*Houston-Sconiers* requires trial courts to consider three factors when sentencing any juvenile in adult court: (1) the mitigating circumstances of youth, including the juvenile's "'immaturity, impetuosity, and failure to appreciate risks and consequences;'" (2) the juvenile's environment and family circumstances, their participation in the crime, and the possible effects of familial and peer pressure; and (3) "how youth impacted any legal defense," as well as "any factors suggesting that the child might be successfully rehabilitated." *Houston-Sconiers*, 188 Wn.2d at 23 (quoting *Miller*, 567 U.S. at 477). The *Houston-Sconiers* holding applies to juvenile defendants sentenced in adult court, as is the case here. *State v. Zwede*, 21 Wn. App. 2d 843, 861, 508 P.3d 1042 (2022). Under the SRA, the juvenile being sentenced "carries the burden of proving by a preponderance of the evidence 'that there are substantial and compelling reasons

justifying an exceptional sentence' below the standard range." *Ramos*, 187 Wn.2d at 434 (quoting RCW 9.94A.535).

The court must meaningfully consider the differences between juveniles and adults, including "'how those differences apply to the facts of the case.'" *Delbosque*, 195 Wn.2d at 121 (citing *Ramos*, 187 Wn.2d at 434-35). Meaningful consideration of the *Houston-Sconiers* factors requires courts to "'do far more than simply recite the differences between juveniles and adults'"; it "must 'receive and consider relevant mitigation evidence bearing on the circumstances of the offense and the culpability of the offender, including both expert and lay testimony as appropriate.'" *Delbosque*, 195 Wn.2d at 121 (citing *Ramos*, 187 Wn.2d at 443).

"[A]ge is not a per se mitigating factor [that] automatically entitl[es] every youthful defendant to an exceptional [downward] sentence." *O'Dell*, 183 Wn.2d at 695, *State v. Anderson*, No. 97890-5, slip op. at 22 (Wash. Sep. 8, 2022).[2] Instead, a juvenile defendant "must show that their immaturity, impetuosity, or failure to appreciate risks and consequences— characteristics of youth that suggest a juvenile offender may be less culpable than an adult offender—contributed to the commission of their crime. *Anderson*, slip op. at 22 (citing *State v. Gregg*, 196 Wn.2d 473, 480, 474 P.3d 539 (2020); RCW 9.94A.535(1)). Although trial courts must meaningfully consider youth, trial courts are not required to impose a sentence outside of the standard range if the trial court considers the qualities of youth at sentencing and determines that a standard range sentence is appropriate. *Houston-Sconiers*, 188 Wn.2d at 21.

---

[2] https://www.courts.wa.gov/opinions/pdf/978905.pdf

14

Here, the resentencing court examined all three *Houston-Sconiers* factors before it denied

Collins's request for an exceptional mitigated sentence. The trial court considered the transcript

of the plea hearing, the transcript of the sentencing hearing, [3] Collins's sentencing memorandum

and attachments, resentencing memorandum, criminal history, victim impact statements, and

other testimony submitted on behalf of both Collins and Parks.

As to the first factor, the mitigating circumstances of youth, the trial court considered

Gerlock's testimony that adolescent brains are less developed in the area responsible for

controlling impulses and understanding consequences. Gerlock's report stated that Collins's

"judgment is impaired because of his young age." CP at 130. The court recognized that

adolescent brains are not fully developed. The trial court recounted the events of Collins's life

from birth to the time of trial, including the evidence of Collins's mother's drug use during

pregnancy, Collins's adoption and subsequent experience at the military academy, and Collins's

experiencing and witnessing physical and emotional abuse. The court noted that the likely effect

of peer pressure, in context of Collins's life experiences and feelings of abandonment, may have

influenced his decision to shoot Parks that night.

The court stated that although it considered Gerlock's report and testimony, Gerlock

could not explain to the trial court's satisfaction what Collins was experiencing at the time of the

crime. The court also considered that Collins held a loaded gun, had a period of time to

reconsider his action, and decided to pull the trigger. The court stated that it was not explained

---

[3] During Collins's 2017 sentencing hearing, the State argued, that it took Collins's youth into account when it reduced his charge. At that hearing, the trial court stated that it took this fact into consideration when it sentenced Collins. The State raised a similar argument during the 2021 hearing remarking that its decision to mitigate was based on *Houston-Sconiers*. In 2021, the court did not explicitly say that it again considered this fact in sentencing Collins.

what could cause Collins to feel the intense fear and anger described by Gerlock. The court said that Collins placed himself in the situation, Parks was outnumbered, Collins was the only armed person, and Parks had walked away. Thus, it appears from the record that although the court considered Gerlock's report, it did not give it much weight as it applied to Collins.

As to the second factor, the juvenile's environment and family circumstances, the trial court considered evidence showing Collins's mother's drug use, Collins's adoption, and subsequent experiencing and witnessing physical and emotional abuse. The judge considered Collins's difficult childhood and mental health conditions. The judge also considered Collins's PTSD diagnosis and how that may have or may have not impacted his actions the night of the crime.

The trial court heard from Collins's biological mother, who shared her regrets that she used drugs heavily during her pregnancy, as well as her opinion that Collins "was not the same boy when he returned from the military school." 2 VRP (Sept. 15, 2017) at 49. The trial court commented, "[A]s a human being and as a mother, it's very sad to read the packet of materials that [defense counsel] gave me . . . . It's very sad that you were exposed to drugs before you even had a chance at a life. It's very sad that you suffered at that academy." 2 VRP (Sept. 15, 2017) at 76.

As to the third factor, facts suggesting that the child might be rehabilitated, the trial court heard testimony from the Maddox who testified that Collins was receptive to work with Catholic Community Services and was committed to bettering himself. At sentencing, Collins also expressed his remorse and committed to changing his life. The court also considered that since

his first sentencing in 2017, Collins had obtained his GED and participated in committees and various programs, which showed Collins's capacity for change.

Despite extensively considering the evidence of youth presented, the trial court explained that Collins likely "had an appreciation for the risk associated with that gun and what would happen if [he] pulled the trigger." 2 VRP (Sept. 15, 2017) at 75-76. As to his PTSD diagnosis, the trial court explained

An underdeveloped adolescent brain and PTSD do not explain [the crime] to me.

I would also say that people of all ages, unfortunately, get PTSD. We see this a lot with people in the military. And I—I'm not going to take up the issue that [defense counsel] had argued that if he had gone to trial he might be entitled to a diminished capacity defense or something like that on PTSD because what I'm supposed to be focused on is the characteristics of youth, and specifically Mr. Collins' youth, and he was diagnosed with that. But that's not a condition of youth, necessarily.

And, again, as I already said, nothing about the facts of that night help me understand what caused him to feel a threat or fear to trigger the kind of response that we see with PTSD.

1 VRP (Aug. 10, 2021) at 44. The trial court also stated that "many people who experience these same events, grow up to be productive members of society. The majority of them certainly do not grow up to kill others . . . . The burden is on Mr. Collins to show me the relationship between those things that happened to him as a youth and what happened that night." 1 VRP (Aug. 10, 2021) at 46.

The trial court very clearly considered the evidence submitted by Collins to establish youth as a mitigating factor, and determined that Collins had not proven by a preponderance of the evidence that his youth justified a mitigated sentence. The court did more than recite the differences between juveniles and adults. Instead, by recounting the events of the evening,

Collins's past, and his PTSD diagnosis, the court endeavored to tie the *Houston-Sconiers'*s factors to the circumstances of crime. The court recognized that a majority people who experience traumatic events, do not grow up to kill others. Because Collins's actions do not align with what a majority of individuals do, the court looked for Collins to show how the *Houston-Sconiers*'s factors affected Collins's actions the night of the crime. The court correctly stated that the "burden is on Mr. Collins to show [the court] the relationship between those things that happened to him as a youth and what happened that night." 1 VRP (Aug. 10, 2021) at 46. Collins failed to meet that burden and to make that connection clear.

Courts are not required to impose an exceptional downward sentence simply because a defendant is under 18—so long as the court meaningfully considered youth, the trial court has discretion to impose whatever sentence it deems appropriate. *Houston-Sconiers*, 188 Wn.2d at 21. Thus, the trial court did not abuse its discretion in imposing a standard range sentence.

### III. SCRIVENER'S ERROR IN JUDGMENT AND SENTENCE

Collins argues that this case should be remanded for the trial court to correct a scrivener's error in the judgment and sentence. The State concedes the error. We accept the State's concession.

CrR 7.8(a) states that clerical errors may be corrected by the court at any time after notice of the error. Here, Collins points to a mistake in the total months of confinement.

Here, the trial court stated that it intended to impose the same sentence of 260 months without the legal financial obligations. However, the judgment and sentence reflected 265

months of total confinement. The record shows that the discrepancy was likely an oversight or unintended error. Thus, it must be corrected to comply with the oral ruling.[4]

Because the error is a result of clerical error, we remand to correct the judgment and sentence in accordance with the oral ruling.

CONCLUSION

We hold that Collins's standard range sentence is appealable. We further hold that the trial court meaningfully considered mitigating factors of Collins's youth. Additionally, we hold that Collins is entitle to correct the scrivener's error in his judgment and sentence. Accordingly, we affirm and remand for the trial court to correct the scrivener's errors.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Worswick, J.

I concur:

Price, J.

---

[4] The State also argues that the first judgment and sentence required Collins to register as a felony firearm offender, but the most recent judgment and sentence did not, and this scrivener's error also must be corrected. However, the State did not file a cross-appeal, and therefore is not entitled to affirmative relief. RAP 2.4; *State v. Sims*, 171 Wn.2d 436, 442-43, 256 P.3d 285 (2011).

GLASGOW, C.J. (concurring in part, dissenting in part)—I agree with the majority that Dakota Mikalle Collins may appeal his standard range sentence by arguing the trial court failed to meaningfully consider the required sentencing factors, and I would accept the State's concession regarding the scrivener's error in the judgment and sentence. But I respectfully dissent because I am troubled by the trial court's failure to meaningfully consider the mitigating factors of youth as *State v. Houston-Sconiers* requires. 188 Wn.2d 1, 21, 391 P.3d 409 (2017).

While the trial court gave lip service to the factors, in several instances, the trial court's findings are not supported by substantial evidence in the record, the trial court effectively ignored a factor, or the court simply declined to give a factor any consideration at all.

"Trial courts *must* consider mitigating qualities of youth at sentencing" using three required factors. *Id*. at 21 (emphasis added). In addition, "courts at all levels must remain vigilant when sentencing Black children, Indigenous children, and children of color to avoid the real bias that has long plagued our justice system," including the "adultification" of children of color. *In re Pers. Restraint of Miller*, 21 Wn. App. 2d 257, 267, 505 P.3d 585 (2022). On appeal, we may consider whether the trial court's findings with regard to the mitigating qualities of youth are supported by the record. *State v. Delbosque*, 195 Wn.2d 106, 116, 456 P.3d 806 (2020).

Here, rather than meaningfully considering the *Houston-Sconiers* factors, the trial court sought to retroactively justify its prior sentencing decision by comparing Collins to other people who have overcome challenges such as early separation from a parent, childhood abuse, and post-traumatic stress disorder (PTSD). The trial court also disregarded adultification of Black children, significant mitigating evidence in the record of Collins's youth, the overt peer pressure at play in

this case, Collins's thoroughly documented mental health issues caused by adverse childhood experiences, and Collins's recent rehabilitation efforts.

I. MITIGATING CIRCUMSTANCES OF COLLINS'S YOUTH

Developments in neuroscience and psychology have shown "fundamental differences between juvenile and adult minds." *Graham v. Florida*, 560 U.S. 48, 68, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010). Juveniles have a "'lack of maturity and an underdeveloped sense of responsibility'" and are "'more vulnerable or susceptible to negative influences and outside pressures.'" *Id.* (internal quotation marks omitted) (quoting *Roper v. Simmons*, 543 U.S. 551, 569-70, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005)). This frequently causes juveniles and young adults to behave in ways that are obviously irrational to mature adults. But juveniles also have a much greater capacity for change and rehabilitation than fully developed adults. *State v. Bassett*, 192 Wn.2d 67, 89, 428 P.3d 343 (2018). Juvenile sentencing jurisprudence has developed accordingly. In response to our prior opinion directing the trial court to meaningfully consider all of the *Houston-Sconiers* factors, the trial court recited many of these cases but did not actually apply their holdings.

The trial court relied on Collins's age as a reason *not* to reduce his sentence based on youth, finding that Collins's age of "16 years, 6 months[,] and 25 days" when he committed the crime was "close in time to his 18th birthday." Verbatim Report of Proceedings (VRP) (Aug. 10, 2021) at 41. The trial court pointed to no authority, and we have found none, supporting a conclusion that 16 year olds and 18 year olds are equally mature and culpable. In fact, cases have said just the opposite for at least 40 years. As early as 1982, the United States Supreme Court in *Eddings v. Oklahoma* stated that the "background and mental and emotional development of a youthful

defendant [must] be duly considered in sentencing," recognizing that "[e]ven the normal 16-year old customarily lacks the maturity of an adult." 455 U.S. 104, 116, 102 S. Ct. 869, 71 L. Ed. 2d 1 (1982).

In *Roper*, Justice Kennedy wrote:

[A]s any parent knows and as the scientific and sociological studies . . . tend to confirm, "[a] lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults and are more understandable among the young. These qualities often result in impetuous and ill-considered actions and decisions." . . . It has been noted that "adolescents are overrepresented statistically in virtually every category of reckless behavior."

543 U.S. at 569 (alterations in original) (quoting *Johnson v. Texas*, 509 U.S. 350, 367, 113 S. Ct. 2658, 125 L. Ed. 2d 290 (1993); Jeffrey Arnett, *Reckless Behavior in Adolescence: A Developmental Perspective*, 12 DEV. REV. 339 (1992)). Science shows that there are "fundamental differences between juvenile and adult minds," particularly in "parts of the brain involved in behavior control [that] continue to mature through late adolescence." *Graham*, 560 U.S. at 68.

Moreover, we have recognized the risk of "adultification" of children of color like Collins in sentencing hearings. *Miller*, 21 Wn. App. 2d at 267. "[W]e recognize that adultification is real and can lead to harsher sentences for children of color if care is not taken to consciously avoid biased outcomes." *Id.*; *see also* Emily Haney-Caron, JD, PhD, & Erika Fountain, PhD, *Young, Black, and Wrongfully Charged: A Cumulative Disadvantage Framework*, 125 DICK. L. REV. 653, 672 (2021) (arguing that "juvenile and criminal legal systems have consistently treated youth of Color more harshly than White youth" in part because "'decision makers throughout the system are less inclined to recognize their developmental immaturity.'" (quoting Kristin Henning, *Criminalizing Normal Adolescent Behavior in Communities of Color: The Role of Prosecutors in Juvenile Justice Reform*, 98 CORNELL L. REV. 383, 387 (2013))).

Nor is there support in the record for the conclusion that Collins was as culpable as an 18 year old. Collins was just 16 years old—an adolescent—when he killed Lorenzo Parks. Dr. April A. Gerlock's testimony is consistent with the studies cited by both federal and state courts that show young people behave irrationally for an array of physiological and neurological reasons. Dr. Gerlock stated that the prefrontal cortex, which governs how we "think of consequences, look to the future, [and] use judgment," is still developing in adolescents such as 16 year olds. VRP (Sept. 15, 2017) at 46. And Collins was no normal 16-year-old child. Dr. Gerlock diagnosed Collins with "moderate to severe, chronic PTSD" and "major depression." Clerk's Papers (CP) at 139, 142. Dr. Gerlock's report expressly stated that Collins suffered from "long-standing mental health problems" and recommended "trauma-informed care." CP at 140, 142. At resentencing, defense counsel argued that due to his history of trauma and mental health struggles, Collins "was functioning below his age" at the time of the murder. VRP (Aug. 10, 2021) at 9. Yet the trial court insisted he was no different from an 18 year old.

The trial court posited that PTSD is not "a condition of youth, necessarily," and that "[a]n underdeveloped adolescent brain and PTSD do not explain" Collins's impulsive actions the night he killed Parks. *Id*. at 44. Dr. Gerlock testified, however, that PTSD also impairs the function of the prefrontal cortex. Collins's youth and PTSD "compounded," resulting in his perception of the "situation as threatening," and a response in a "reactive impulsive way." VRP (Sept. 15, 2017) at 47.

Gerlock's report stated that "Collins' judgment [was] impaired because of his young age, major mental health disorders, and further impaired by marijuana and/or alcohol intoxication." CP at 305. The trial court doubted Dr. Gerlock's assertion that Collins reported "'intense fear and

23

anger and reacted impulsively'" during the murder. VRP (Aug. 10, 2021) at 43. The trial court appeared to expect a logical explanation for why Collins and his codefendants accosted Parks, and why Collins shot Parks after the robbery was completed. But juvenile sentencing has evolved in recent years precisely because of the Supreme Court's recognition that children do horrible things for irrational reasons—especially when their childhood has been marred by traumatic events. *See Bassett*, 192 Wn.2d at 89-90. And the trial court ignored Dr. Gerlock's clear conclusions that Collins's judgment was impaired at the time of his crime because of his youth combined with diagnosed mental health disorders.

The State is correct in that "nothing miraculous happens on your 18th birthday." VRP (Sept. 15, 2017) at 75. "[A]ge may well mitigate a defendant's culpability, even if that defendant is over the age of 18." *State v. O'Dell*, 183 Wn.2d 680, 695, 358 P.3d 359 (2015). The "cognitive and emotional development" in the years leading up to adulthood can "amount to a substantial and compelling factor" in diminishing a defendant's culpability even before factoring in severe mental and developmental trauma during adolescence. *Id.* at 695-96. In the initial sentencing hearing, the trial court gave little weight to Dr. Gerlock's report because "the facts . . . don't sound like a person who was in fear for their life." VRP (Sept. 15, 2017) at 74. At resentencing, the trial court found "limited evidence of how Mr. Collins's life experiences impacted him as an individual." VRP (Aug. 10, 2021) at 45. After commenting that Collins's youth and PTSD diagnosis did not explain his actions, the trial court stated that "there are reports of things that happened to him, but there's no testimony that takes that and tells me how that caused him to make the decisions that he made." *Id*.

24

But Collins provided evidence that he suffered from mental health and anger issues even *before* his adoptive parents sent him across the country to a military academy. The abuse he suffered for almost a year at the academy resulted in him returning home with even more anger, resulting in his additional oppositional defiance disorder and PTSD diagnoses. Dr. Gerlock's report linked Collins's "impaired" judgment to his youth, mental health disorders, and substance abuse. CP at 305. It is not clear why a 16-year-old boy's three mental health diagnoses—all of which relate to his anger, impulsivity, and irrational behavior—would not help explain why he murdered someone who posed no threat and was walking away. The trial court's finding there was no connection between Collins's childhood experiences, his mental health diagnoses, and his crime is not supported by the record. The record reflects instead a high likelihood that these factors impacted his ability to accurately judge the consequences of his actions, and the trial court failed to meaningfully account for these factors rather than dismiss them.

## II. COLLINS'S SURROUNDING ENVIRONMENT AND FAMILY CIRCUMSTANCES, THE EXTENT OF HIS PARTICIPATION IN THE CRIME, AND THE EFFECTS OF FAMILIAL AND PEER PRESSURE

During sentencing, a trial court "must also consider factors like the nature of the juvenile's surrounding environment and family circumstances, the extent of the juvenile's participation in the crime, and 'the way familial and peer pressures may have affected [the juvenile].'" *Houston-Sconiers*, 188 Wn.2d at 23 (quoting *Miller v. Alabama*, 567 U.S. 460, 477, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012)). These factors are significant because juveniles "'are more vulnerable . . . to negative influences and outside pressures,' including from their family and peers . . . and lack the ability to extricate themselves from horrific, crime-producing settings." *Miller*, 567 U.S. at 471 (first alteration in original) (quoting *Roper*, 543 U.S. at 569). Trial courts must perform an individualized assessment of the impact of these circumstances on the defendant. *O'Dell*, 183

25

Wn.2d at 691; *see also State v. Ramos*, 187 Wn.2d 420, 387 P.3d 650 (2017). Here, the trial court did not sufficiently apply the second *Houston-Sconiers* factor in Collins's resentencing.

In Collins's first appeal, we concluded that the trial court did not evaluate how Collins's environment and family circumstances affected him as an individual. *State v. Collins*, No. 51511-3-II, slip op. at 15 (Wash. Ct. App. Dec. 15, 2020) (unpublished) https://www.courts.wa.gov/opinions/pdf/D2%2051511-3-II%20Unpublished%20Opinion.pdf. At the resentencing hearing, the trial court focused on the fact that Collins "did not receive either a literal or a de facto life without [parole] sentence." VRP (Aug. 10, 2021) at 48. Trial courts must consider individualized, particular vulnerabilities of all juvenile defendants, not just those who receive life sentences without parole. *Houston-Sconiers*, 188 Wn.2d at 21.

Collins is exactly the type of defendant contemplated by the *Houston-Sconiers* decision. Collins's biological mother left him when he was a toddler. He remembers early feelings of abandonment. While he was adopted as a toddler, Collins grew up in a challenging school and family environment. His biological mother is a registered sex offender with a history of behavioral health disorders. Collins was exposed to gang affiliations as early as second grade. Collins began drinking alcohol and became involved in gang activity by the time he was in fourth grade. He reported that he was shot when he was 11 years old because his adopted older sister was involved in gang activity.

Collins was sent to Southeastern Military Academy at age 12, where he was "physically, psychologically, and sexually abused." CP at 132. In his interview with Dr. Gerlock, Collins recalled being assaulted by school staff; he was "slammed . . . repeatedly down to the floor" because he "stopped exercise for only a couple of seconds." *Id.* In another incident, Collins was

woken up from sleep by other students, who beat him with improvised blackjacks. When he "turned 13 at the academy," he was given a cake and a belt, and as a Black child, was told, "'There's a tree . . . a tree to kill yourself. Or go run into the traffic and kill yourself.'" CP at 134 (alteration in original). School staff "threatened to drop him off at a near-by KKK camp." *Id*.

After returning from the military school in the eighth grade, Collins was kicked out of his adopted parents' home. He went to live with his biological mother. Collins's biological mother had been incarcerated several times, including for first degree child molestation; she also had "issues with drug abuse" and had previously had her parental rights terminated after the Department of Social and Health Services alleged that she failed to provide "safe, stable housing for her children and lack[ed] adequate parenting skills." CP at 66. In sum, by age 16, Collins had already experienced abandonment, gang affiliations, physical and sexual abuse including abuse based on his race, gun violence, and substance abuse.

Collins did play a central role in the crime, as he fired the shot that killed Parks. The trial court, however, failed to meaningfully account for the overt peer pressure influencing him that night. Parks was with a group of teenagers and his codefendant, James Purnell Mapp, yelled "'Shoot him, shoot him, shoot him,'" as Parks was walking away, causing Collins to fire. VRP (Aug. 10, 2021) at 32.

The trial court acknowledged that Collins "was impacted by peer pressure," and recited some of the hardships Collins faced in his childhood and at the military school VRP (Aug. 10, 2021) at 45. For example, at Collins's first sentencing hearing, the trial court told Collins that it was "very sad that you were exposed to drugs before you even had a chance at life," and that it was "very sad that you suffered at [the military] academy." VRP (Sept. 15, 2017) at 76. At the

resentencing hearing, the court again conveyed the same sentiment: "these things are not what we wish for our children." VRP (Aug. 10, 2021) at 46. But the trial court completed this analysis by emphasizing that "many people who experience these same events, grow up to be productive members of society. The majority of them certainly do not grow up to kill others." *Id.*

This may be true, but a comparison to children who have overcome adversity without committing crimes is particularly troubling because it not only disregards the individualized assessment requirement, but also trivializes the very real impacts of adverse childhood experiences. *O'Dell*, 183 Wn.2d at 691. Meanwhile, "juvenile offenders of color are [often] seen as more blameworthy and deserving of harsher punishment" by decision-makers in the justice system. WASH. SUP. CT. GENDER & JUST. COMM'N, 2021: HOW GENDER AND RACE AFFECT JUSTICE NOW: FINAL REPORT 453 (Sept. 2021). The trial court responded to Collins's long list of severe adverse childhood experiences, not with an individualized meaningful consideration of their impact on his behavior and ability to control his impulses at 16, but instead with an expectation that he pull himself up by his bootstraps like others who had overcome adversity. Because there will always be other people a court can point to who have overcome adversity, it is hard to imagine what juvenile offender would ever be entitled to a reduced sentence under this reasoning.

Comparing Collins's circumstances with those of others who have successfully overcome obstacles defeats the purpose of the *Houston-Sconiers* requirement of *individualized* consideration of the surrounding environment, family circumstances, and peer influences.

### III. FACTS SUGGESTING COLLINS MIGHT BE SUCCESSFULLY REHABILITATED

The trial court failed to adequately consider Collins's potential for rehabilitation in light of his allocution, emphasizing instead the absence of Department of Corrections (DOC) records.

When sentencing a juvenile, the trial court must consider "any factors suggesting that the child might be successfully habilitated." *Houston-Sconiers*, 188 Wn.2d at 23. Juveniles have a "heightened capacity for change," *Miller*, 567 U.S. at 479, because "'as individuals mature, the impetuousness and recklessness that may dominate in younger years can subside,'" *Roper*, 543 U.S. at 570 (quoting *Johnson*, 509 U.S. at 368). Accordingly, "resentencing courts *must* consider the measure of rehabilitation that has occurred since a youth was originally sentenced." *Delbosque*, 195 Wn.2d at 121 (emphasis added).

At the resentencing hearing, Collins's attorney stated that Collins had made progress since his first sentencing and sought DOC records to support his allocution statements. Counsel explained that DOC did not provide the records in time to present them at the resentencing hearing. During allocution, Collins elaborated on his progress: he had a fiancée, had "obtained [his] GED," "maintained above a 3.0 GPA on [his] college courses," and joined various therapy and social programs. VRP (Aug. 10, 2021) at 24. He was the youngest member of the Black Prisoners' Caucus, a group that focuses "on topics such as breaking the cycle of incarceration, trauma, and the school-to-prison pipeline." Jaime M. Hawk & Breanne M. Schuster, *"We Are Still Citizens, Despite Our Regrettable Past": Why A Conviction Should Not Impact Your Right to Vote*, 18 SEATTLE J. FOR SOC. JUST. 75, 76 (2019). He had a mentor, a reentry specialist and "successful business owner," who helped him with his resume, jobs, outreach groups, "and other tools to help [Collins] be a successful member of society." VRP (Aug. 10, 2021) at 27. The State offered no evidence to the contrary.

Collins demonstrated remorse, self-awareness, and maturity during allocution, which together with his reported progress, support his capacity for change. Collins stated that since his

first sentencing, he lost his "stepfather, little sister and several cousins to gun violence," but he wanted to "honor them by making a positive difference in [himself] and those around [him]." *Id.* at 26. He took responsibility for his actions, acknowledging that his "innocence and childhood [were] cut short due to the choices [he had] . . . made." *Id.* Collins sought to become an "honorable, responsible man," and recognized the "self-effort" required to do so. *Id.* at 28. And children's increased capacity for rehabilitation is precisely why courts resentencing former juvenile defendants "must consider the measure of rehabilitation that has occurred since [the] youth was originally sentenced." *Delbosque*, 195 Wn.2d at 121.

Since his first sentencing, Collins has demonstrated that he is willing to change. His remarks during allocution suggest that he has the potential to be rehabilitated. The only evidence offered was evidence that Collins demonstrated progress since his last sentencing. Any doubts about the veracity of his factual assertions could have been resolved by postponing sentencing until DOC provided the requested records.

To be clear, I do not conclude that a 21-year sentence is inherently improper where a 16-year-old has taken the life of another person. A trial court could meaningfully consider the *Houston-Sconiers* factors, make findings supported by this record, and conclude that an exceptional downward sentence is not warranted. And I agree with the State that one legitimate consideration is the benefit that the child obtained from any plea bargain and the reduction in the standard sentencing range that resulted from the plea.

But trial courts must apply a detailed, individualized analysis of the *Houston-Sconiers* factors that is supported by the record when sentencing juvenile defendants. Rather than dismissing them, the trial court here should have meaningfully considered Collins's youth, upbringing, and

circumstances, in addition to his mental health diagnoses, which an expert testified impaired his judgment on the day of his crime. The trial court should have meaningfully considered the overt peer pressure that influenced Collins on the day of the crime. The trial court should not have dismissed the required factors and evidence that was actually in the record in favor of comparing Collins with others who have overcome adversity. Since his arrest, Collins has demonstrated capacity for change. I would hold that the trial court still has not meaningfully considered the required *Houston-Sconiers* factors or applied the factors to the facts in this record.

For the reasons stated above, I respectfully dissent.

Glasgow, C.J.